IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MARCUS A. SMITH,                    )
                                    )
          Plaintiff,                )
                                    )
     v.                             )    Civil Action No.: 1:06cv00907
                                    )
COMPUTER TASK GROUP, INC.,          )
                                    )
          Defendant.                )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

This diversity matter is before the court on Defendant
Computer Task Group, Inc.'s ("CTG"), Motion for Summary Judgment
(Doc. 27) and Motion to Strike (Doc. 37), pursuant to Federal Rule
of Civil Procedure 56. For the reasons set forth below, the court
will deny the Motion to Strike but disregard the challenged
evidence and grant the Motion for Summary Judgment.

**I.   PROCEDURAL BACKGROUND**

Plaintiff Marcus Smith ("Smith"), a North Carolina resident,
filed this action against CTG, a New York corporation, in the
Superior Court of Durham County, North Carolina, on September 11,
2006. (Doc. 4.) Smith alleges wrongful termination in retaliation
for filing a workers' compensation claim and both intentional and
negligent infliction of emotional distress under North Carolina
law. (Id. at 4.)

CTG timely removed this action to this court on the grounds of diversity jurisdiction, pursuant to 28 U.S.C. § 1332 (2006).[1] (Doc. 2.) Following the completion of discovery, CTG moved for summary judgment. (Doc. 27.) Smith's response to the motion relies in part on the North Carolina Employment Security Commission's decision granting him benefits following his termination ("ESC Decision"). (Doc. 31 at 12-14.) CTG moves to strike the ESC Decision and any related argument on the grounds they are barred by North Carolina law. (Doc. 37.)

## II. FACTUAL BACKGROUND

For purposes of the motion for summary judgment, the court views the following evidence in the light most favorable to Smith. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

### A. Employment with CTG

CTG recruits persons who are hired by third parties in need of specific skill sets. One of CTG's clients is International Business Machines Corp. ("IBM"), with whom CTG has an exclusive agreement to place contract employees. (Doc. 28 Ex. A at 62; Doc. 33 Borden Dep. at 25.) Pursuant to this agreement, IBM issues, and CTG enters into, a separate "purchase order" to staff each IBM

---

[1] Smith also sought to amend the Complaint to add employees of CTG and IBM as defendants and moved to remand the action on the ground that their presence would defeat diversity. (Docs. 8 & 9.) The court denied both motions. (Doc. 14 at 1.)

2

position. (Doc. 33 Powers Dep. at 23-24.) Each purchase order is one year in duration and may be renewed by IBM. (Id. Powers Dep. at 25-27, 32.) IBM has the authority to interview, select and/or reject proposed candidates, dictate their work schedules, and even terminate the purchase order, and thus the employee, for any reason. (Id. Powers Dep. at 25-27, 29-32, West Dep. at 16; Tr. of Oral Argument at 3.)

When a client terminates a purchase order, CTG considers three alternatives: (1) transfer the employee to another open position; (2) layoff the employee until CTG has a suitable position; or (3) terminate the employee for cause. (Doc. 28 Ex. C ¶ 7; Doc. 33 Borden Dep. at 174-75, 186, Powers Dep. at 24-25, 28-29.) Employment with CTG ends upon termination of the purchase order, unless CTG has another position "ready and waiting." (Doc. 33 Borden Dep. at 175.) A termination for cause precludes a person from future employment with CTG and is exercised only in extenuating circumstances. (Id. Borden Dep. at 185-86; Powers Dep. at 24-25.) CTG retains the sole authority to reprimand its employees or terminate them from CTG. (Id. Powers Dep. at 30-31.)

Smith was an at-will employee of CTG from July 2005 until his termination on March 16, 2006. (Doc. 28 Ex. A at 30, Ex. C ¶¶ 5, 9, Ex. E ¶ 6, Ex. H at 58; Doc. 33 Borden Dep. at 212; Doc. 59 Ex. A at 46.) CTG placed Smith as a technician on IBM's campus in the

Research Triangle Park in Durham, North Carolina, pursuant to a purchase order.[2] (Doc. 28 Ex. A at 30, 109, Ex. C ¶ 5.) During his tenure, IBM made no complaint regarding his technical skills (Doc. 33 Powers Dep. at 17-18, 49, Borden Dep. at 38, 39-40, 68, 82-83, 97-98, 216, West Dep. at 18-20, 41-44; see Doc. 28 Ex. A at 80; Doc. 31 Ex. A ¶ 14) and was rated as "outstanding" by an IBM team leader (Doc. 33 West Dep. at 20). Apart from his substantive performance, Smith did have a volatile personality conflict with an IBM program manager named Michael Parris ("Parris") (Doc. 28 Ex. A at 79, 85-86, 99-100, 125-26, Ex. H at 113-26; Doc. 31 Ex. A ¶ 8; Doc. 33 Borden Dep. at 82-83, 96, 138, 190-91, 214-15, West Dep. at 44-47, 73-75), yet IBM renewed the purchase order for his services in January 2006 (Doc. 33 Powers Dep. at 32, Borden Dep. at 183).

## B. Workplace Injury and Workers' Compensation Claim

On December 21, 2005, Smith injured his knee while moving a piece of computer equipment at IBM's campus. (Doc. 28 Ex. A at 99-103; Doc. 31 Ex. A ¶ 6; Doc. 33 West Dep. at 54.) He immediately mentioned the injury to his IBM team leader (Doc. 33 West Dep. at 55-56) but did not report it to CTG until a meeting with his CTG

---

[2] Smith previously worked in the same position at IBM as a contract employee of another entity for approximately four years. (Doc. 28 Ex. A at 29-30; Doc. 33 West Dep. at 13-14.) When CTG was awarded the exclusive agreement with IBM, it agreed to pay Smith a "retention bonus" if he continued to work for its clients. (Doc. 33 Powers Dep. at 54-58.) This retention bonus could be withheld only if Smith was terminated for cause, voluntarily resigned or failed to satisfy performance obligations. (Id. Powers Dep. at 56.)

4

site manager, Julie Powers ("Powers"), on January 3, 2006 (Doc. 28 Ex. A at 68-69, 101-02). Powers not only encouraged but, according to Smith, *insisted* that he file a workers' compensation claim. (Tr. of Oral Argument at 40; Doc. 28 Ex. A at 68-69; <u>see</u> Doc. 28 at 12-13; Doc. 36 at 4.) CTG also assisted him in submitting the required paperwork. (Doc. 28 Ex. A at 69; Doc. 33 Powers Dep. at 36-37.) On January 5, 2006, Gallagher Bassett Services, Inc., CTG's third-party administrator for workers' compensation claims, filed the appropriate paperwork with the North Carolina Industrial Commission (Doc. 28 Ex. A at 101-03, Ex. E ¶ 5) and subsequently approved Smith's treatment plans and started paying covered expenses. (Doc. 31 Ex. A ¶ 6.)

### C. Workplace Issues

After Smith filed his workers' compensation claim, IBM and CTG allowed him to take time off for doctor's appointments and physical therapy sessions. (Doc. 33 Borden Dep. at 50.) Ostensibly to accommodate his injury and remove him from a workspace where further lifting was required,[3] two IBM managers, Parris and Edward Ramirez ("Ramirez"), assigned Smith to Building 205 to work on "knowledge transfer" with another IBM team member located there and provided him a handicapped parking space. (Doc. 28 Ex. A at 92,

---

[3] Smith's job description to work in the lab in Building 002 required him to be able to lift up to 50 pounds. (Doc. 33 Powers Dep. at 58-59.)

5

112, 116, 125, Ex. 20, Ex. F ¶ 6, Ex. H at 15-17; Doc. 33 Borden Dep. at 47, 53-55, 59, 60, 65-66; Doc. 34 Parris Dep. at 110-11, 112-13, 118-19.) IBM also requested that Smith no longer work from home. (Doc. 34 Parris Dep. at 110; see Doc. 28 Ex. A at 112.)

Smith complained that he wanted to return to Building 002 for medical reasons. He asserted that Building 205 was a longer walk from the parking lot (although IBM provided him a handicapped space) and was farther away from a cafeteria, which he claimed he required in order to have access to food and drink when he took his medication. (Doc. 28 Ex. A at 115, 122; Doc. 31 Ex. A ¶ 8; see Doc. 33 Borden Dep. at 51, 59-60.) CTG and IBM required him to provide a doctor's note describing his additional claimed physical limitations and advised him to bring snacks to work to eat with his medication, when necessary. (Doc. 28 Ex. A at 116-17, 122, Ex. F ¶ 8; Doc. 33 Borden Dep. at 51, 52, 60, 170.)

In January 2006, Dawn Borden ("Borden") replaced Powers as Smith's CTG site manager. (Doc. 31 Ex. A ¶ 5.) Smith claims that Borden initially failed to respond to his requests for a meeting to discuss his physical limitations. (Id. Ex. A ¶ 7.) He also says that Borden failed to persuade IBM to return him to Building 002, absent a doctor's note. (Doc. 28 Ex. A at 115-17, 122; see Doc. 33 Borden Dep. at 52, 60, 169-71.) When Smith provided such notes to IBM and Borden, IBM found them to be inadequate to justify his

6

return to Building 002, and Borden allegedly rejected three or four notes as insufficient to overcome IBM's concerns. (Doc. 28 Ex. A 116-17; Doc. 33 Borden Dep. at 52, 60, 170.)

The record also reflects that Smith's relationship with Parris was deteriorating, to the point that Smith was openly questioning Parris' judgment in e-mails to Ramirez. (Doc. 28 Ex. A at Ex. 20.) Relations reached the point where Smith needed a "mediator" or "go-between" to interact successfully with Parris. (Id. Ex. A at 79-80, 125-26.) During this general time frame, Smith asked Powers and Borden to investigate the possibility of redeploying him to another job, but nothing suitable was available. (Doc. 33 Borden Dep. at 152, 176, Powers Dep. at 32, 54.)

On February 20, 2006, Smith met with Borden to complain about "all the problems [he] had had with Parris and [Parris's] overall attitude regarding [his] injury" and informed her that his doctor recommended surgery on his injured knee. (Doc. 31 Ex. A ¶ 9; see Doc. 33 Borden Dep. at 129-33.) Smith reports that "Borden advised me that the 'IBM thing might not be for you. If you leave today, you can file for unemployment and I won't contest it.'" (Doc. 31 Ex. A ¶ 9.) Smith further claims that "Borden immediately showed dissatisfaction with my physical limitations and an unwillingness to accommodate me." (Id.)

## D. Termination of IBM Purchase Order

By at least February 2006, IBM had begun to raise concerns with CTG about Smith. (Doc. 33 Borden Dep. at 50-51.) On March 7, Borden reiterated to Smith that he needed to abide by IBM's request to work in Building 205. (Doc. 28 Ex. H at Ex. 23; Doc. 33 Borden Dep. at 50-52.) Borden contends that Smith agreed to do so (Doc. 33 Borden Dep. at 139-40, 170; see Doc. 28 Ex. H at Ex. 23), yet he continued to work from Building 002 or from home (Doc. 28 Ex. A at 177-78, Ex. F ¶¶ 8, 9; Doc. 33 Borden Dep. at 50-52).

Things soon came to a head. On Friday, March 10, Ramirez called Borden because he could not locate Smith. (Doc. 28 Ex. F ¶ 9; Doc. 33 Borden Dep. at 71-74.) Borden determined that, despite IBM's directives, Smith was working from home. (Doc. 33 Borden Dep. at 74.) Assuring Borden that he had just participated in an IBM conference call that morning from home (Doc. 31 Ex. A ¶ 11), Smith declined to go to the office because he had washed his knee brace the night before and it was still wet (Doc. 28 Ex. A at 177-78; Doc. 33 Borden Dep. at 74). When Borden asked Smith how she should explain this to Ramirez, he told her to relay that particular excuse. (Doc. 33 Borden Dep. at 74-75.)

On Monday, March 13, Ramirez notified Borden that he had decided to exercise IBM's right to terminate the purchase order for Smith effective Wednesday, March 15, or Thursday, March 16

8

(depending on when CTG could notify Smith).  (Doc. 28 Ex. F ¶ 10;
Doc. 33 Borden Dep. at 88-91.)  Although Ramirez did not articulate
any reason for the termination at that time, Borden assumed it was
based on IBM's ongoing concerns about Smith's lack of cooperation,
failure to report to Building 205, inadequate communications, and
personality conflicts with IBM management.  (Doc. 33 Borden Dep. at
95-97, 136-38.)

On Wednesday, March 15, Borden attempted to notify Smith that
IBM was terminating his purchase order.  (<u>Id.</u> Borden Dep. at 113,
199; <u>see</u> Doc. 28 Ex. C ¶ 7.)  She could not find him in Building
205, and when she tried to find him in Building 002 he had already
left for the day.  (Doc. 33 Borden Dep. at 113, 150, 164-65, 197,
199.)  So, she decided to talk with him in the morning.  (<u>Id.</u>
Borden Dep. at 113, 150, 164-65, 197, 199.)  In the meantime,
Ramirez terminated Smith's access to the IBM computer network that
evening.  (Doc. 28 Ex. F ¶ 10; Doc. 33 Borden Dep. at 120-21.)

The next morning, Thursday, March 16, Borden again could not
find Smith in Building 205 or 002.  (Doc. 33 Borden Dep. at 98-99,
105, 107-08, 113-14, 163-64, 180.)  She eventually reached him on
his wireless telephone and learned that he was in a training class
in Building 203.[4]  (<u>Id.</u> Borden Dep. at 99-100, 108, 180.)  Borden

---

[4]    Ramirez testifies that Smith was not authorized to attend a
training class on March 16, 2006.  (Doc. 28 Ex. F ¶ 11.)  Although Smith
counters that Parris had authorized him to attend this training class,
which was rescheduled from January 26 to March 14 (Doc. 31 Ex. A ¶ 11),

9

asked Smith to meet her in the hallway, yet he failed to do so, and she had to enter the classroom to extract him. (Id. Borden Dep. at 100-02, 144-46, 205; see Doc. 28 Ex. C ¶ 9.) Borden claims he "made a scene" in front of the client (Doc. 33 Borden Dep. at 101-02, 108-09, 144-46; see Doc. 28 Ex. C ¶ 9); Smith denies it (Doc. 31 Ex. A ¶ 12).

In a nearby conference room, Borden informed Smith that IBM had terminated him. (Doc. 33 Borden Dep. at 108-09.) At Borden's request, Smith turned in his laptop computer (which was the property of IBM), after logging-on and downloading his personal pictures. (Doc. 28 Ex. A at 182, Ex. H at 44; Doc. 31 Ex. A ¶ 12; Doc. 33 Borden Dep. at 117-18, 126-27, 148.) As per CTG's procedure, Smith provided log-on passwords, which Borden recorded on the Employee Separation Checklist, and Smith signed the Checklist in Borden's presence to verify their accuracy. (Doc. 28 Ex. A at 182, 187-88, Ex. 19, Ex. H at 44; Doc. 31 Ex. A ¶ 12; Doc. 33 Borden Dep. at 116-17, 118-19, 126-27, 158-59.)

CTG and IBM could not log-on to the laptop using the passwords Smith provided on the Separation Checklist. (Doc. 28 Ex. F ¶ 12; Doc. 33 Borden Dep. at 117, 122-23; Doc. 34 Parris Dep. at 89-90.) Borden contacted Smith later that day, but he did not provide working passwords. (Doc. 33 Borden Dep. at 123-26; Doc. 34 Parris

Borden found Smith in the class on March 16 (Doc. 33 Borden Dep. at 99-100, 108, 180).

10

Dep. at 91-92.)   Smith initially claimed that Borden must have transcribed the passwords incorrectly, that IBM must not have asked a technically inclined person to enter the passwords into the laptop, and/or that IBM should simply "wipe" the laptop clean. (Doc. 28 Ex. A at 187-88, 190-91, Ex. H at 60-65; <u>see</u> Doc. 33 West Dep. at 50-51, Borden Dep. at 217.)   Smith subsequently provided through counsel yet a different set of passwords, including one that read "AZZH0LES," but none of those passwords worked, either. (Doc. 28 Ex. A at Ex. 17; Doc. 33 Borden Dep. at 221.)   CTG states that IBM, its client, still cannot access information on the laptop using Smith's passwords.   (Doc. 33 Borden Dep. at 126-28; <u>see</u> Doc. 28 Ex. F ¶ 12.)

### E.   Termination of Plaintiff's Employment with CTG

On March 13, after IBM had notified Borden of its decision to terminate Smith's purchase order, Borden contacted CTG's Director of Employee Relations, Gina Daley, to discuss next steps.   (Doc. 28 Ex. C ¶ 7; Doc. 33 Borden Dep. at 89, 195-96.)   CTG says that it searched for other positions for Smith at that time but found none that matched his skills and salary demands.   (Doc. 33 Borden Dep. at 153-57, 176-77.)   On March 14, CTG prepared a draft letter to Smith to confirm his termination from IBM and CTG, but Borden and Daley reassessed their decision after the events of March 16 and modified the letter to incorporate additional reasons justifying a

termination for cause. (Doc. 28 Ex. C ¶ 9; Doc. 33 Borden Dep. at 159-63, 178, 180, 181, 194, 200-02, 203-05, 207-13.) Neither party has provided the court with the earlier draft, but the final draft bore a March 15 date even though it references insubordination grounds that did not occur until March 16. (Doc. 28 Ex. H at Ex. 23.) Smith claims that CTG never attempted to redeploy him (though he provides no evidence that a suitable job existed) and speculates that the bases in the termination letter are pretextual. (Doc. 31 at 5, 11; Tr. of Oral Argument at 53-54, 56-60.) Shortly after Smith's termination from CTG, Gallagher Bassett discontinued his workers' compensation benefits — because it questioned whether the injury was work-related — but eventually reinstated them. (Doc. 28 Ex. E ¶ 7, Ex. H at 154; Doc. 60 Ex. A; Tr. of Oral Argument at 34, 36-37.) The evidence does not establish that CTG directed any of the insurer's decisions. (Doc. 28 Ex. E ¶ 4; Tr. of Oral Argument at 36-37.)

## III. ANALYSIS

### A. Motion to Strike

Smith attempts to use the ESC Decision to demonstrate that CTG terminated him without cause, thereby supporting his claims he was wrongfully terminated. (Doc. 31 at 12-14; Doc. 47 at 1-2, 2-4.) CTG argues that the ESC Decision is inadmissible under the express terms of N.C. Gen. Stat. § 96-4(t)(8) (2007) and moves to strike it

12

pursuant to Rule 56, Fed. R. Civ. P. (Doc. 37 at 1; Doc. 38 at 1-2.)

Rule 56(e), Fed. R. Civ. P., does not speak to motions to strike but rather requires that a party moving for summary judgment submit *admissible evidence* in support. Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993). The court therefore treats CTG's motion as an objection to the admissibility of the ESC Decision and any discussion of it. See Parco Merged Media Corp. v. Multispectral Solutions, Inc., No. 2:06cv46, 2006 U.S. Dist. LEXIS 29453, at *7 n.5 (E.D. Va. Apr. 21, 2006).

The Federal Rules of Evidence, not state law, govern the admissibility of evidence in diversity actions in the federal courts. Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1054 (4th Cir. 1986). Despite this presumption, a federal court may apply a state evidentiary rule that embodies or is closely tied to a state substantive policy. Hottle v. Beech Aircraft Corp., 47 F.3d 106, 109-10 (4th Cir. 1995). The North Carolina General Assembly has established a substantive policy that ESC decisions are inadmissible in subsequent actions before federal courts:

> Any finding of fact or law, judgment, determination, conclusion or final order made by an . . . appeals referee . . . pursuant to the Employment Security Law is not admissible or binding in any separate or subsequent action or proceeding, between a person and his present or previous employer brought before an arbitrator, court or judge of this State or the United States, regardless of

13

> whether the prior action was between the same or related
> parties or involved the same facts.

N.C. Gen Stat. § 96-4(t)(8).  The parties have effectively agreed to abide by this state evidentiary rule by virtue of their participation in the ESC process.

Section 96-4(t)(8) plainly renders inadmissible the ESC Decision and any reference to it in Smith's response to the Motion for Summary Judgment.[5]  See <u>Woodle v. Onslow County ABC Bd.</u>, 178 N.C. App. 372, 376-77, 631 S.E.2d 199, 202 (2006).  The ESC Decision meets all the prerequisites for inadmissibility under this statute.  Smith argues that "the spirit of the statute" does not prohibit the introduction of *testimony* from the ESC hearing, apparently referring to section 96-4(t)(5), and that the doctrine of judicial estoppel permits its use.  (Doc. 47 at 1-4.)  Both arguments are irrelevant as no such evidence is offered.  The court will therefore disregard the ESC Decision and any reference to it in Smith's response to the Motion for Summary Judgment.

**B.   Motion for Summary Judgment**

CTG moves for summary judgment on all claims in the Complaint: wrongful discharge in violation of the public policy of North

---

[5]   In light of this ruling, the court need not consider CTG's doubtful assertion that the ESC Decision is also an "absolutely privileged communication."  (Doc. 38 at 2); <u>see</u> N.C. Gen. Stat. § 96-4(t)(5) (indicating that the privilege applies only to "letters, reports, communication, or any other matters . . . from the employer or employee to each other or to the Commission or any of its agents, representatives, or employees").

14

Carolina, as embodied in the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-241 ("REDA"); and both intentional and negligent infliction of emotional distress under North Carolina law. (Doc. 27 at 1; <u>see</u> Doc. 4 at 4.) Each claim is addressed in turn.

### 1. Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those identified by controlling law as essential elements of the claims asserted by the parties. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). An issue is genuine as to such facts if the evidence is sufficient for a reasonable trier of fact to find for the nonmoving party. <u>Id.</u> No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). When ruling on a motion for summary judgment, a court "is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." <u>Shaw</u>, 13 F.3d at 798; <u>accord</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

15

The moving party bears the burden of initially "demonstrat[ing] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Once the moving party has carried its burden, the nonmoving party must present specific evidence which shows more than some "metaphysical doubt" that a genuine issue of material fact requires trial. Matsushita, 475 U.S. at 586. The "mere existence of a scintilla of evidence" is insufficient to defeat summary judgment. Anderson, 477 U.S. at 252. Even where intent and motive are crucial to determining the outcome of the cause of action, unsubstantiated speculation and bare assertions will not withstand summary judgment. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). The nonmoving party must instead convince the court that, upon the record taken as a whole, a rational trier of fact could find for the moving party. Anderson, 477 U.S. at 248-49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell, 12 F.3d at 1315-16.

## 2. REDA

### (a) One Claim or Two?

The parties dispute initially whether Count One of the Complaint states one employment claim, under North Carolina public policy, or two, including a substantive claim under REDA.

16

Under the Federal Rules of Civil Procedure's notice pleading standard, Rule 8(a)(2) merely requires "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (internal quotation marks and citation omitted). Rule 8(d)(2) allows a plaintiff to "set out 2 or more statements of a claim or defense alternatively or hypothetically . . . in a single count." Fed. R. Civ. P. 8(d)(2). Courts have interpreted Rule 8(d)(2) to allow a plaintiff to plead separate causes of action in a single count of the complaint.[6] Sherman v. Johnson & Towers Baltimore, Inc., 760 F. Supp. 499, 500-01 (D. Md. 1990); see Green v. C.B. Fleet Holding Co., No. 07-80589-CIV, 2008 U.S. Dist. LEXIS 1169, at *3-6 (S.D. Fla. Jan. 8, 2008) (declining to dismiss causes of action for fraud and negligent misrepresentation pleaded in the same count, even though they require different elements).

In Count One of the Complaint, Smith alleges that CTG "is liable . . . for Wrongful Termination in violation of the Public Policies of the state of North Carolina, namely N.C.G.S. § 95-241." (Doc. 4 at 4.) Although far from a model of clarity, the Complaint

---

[6] The requirement of Rule 10(b), Fed. R. Civ. P., to state each claim in a separate count "[i]f doing so would promote clarity" does not apply to the REDA and public policy claims because they arise from the termination of Smith, which constitutes the same "transaction or occurrence."

17

sufficiently references REDA to put CTG on notice of a potential claim.[7]  The Complaint also requests attorneys' fees, which are unavailable for any other claim alleged in the Complaint, and Smith attached the right-to-sue letter from the North Carolina Department of Labor (Id. Ex. A), a prerequisite to  bringing a claim under REDA.[8]  N.C. Gen. Stat. § 95-243(e).  Moreover, in its Answer, CTG acknowledges that the alleged REDA violation is a central component of the Complaint.  (Doc. 7 at 5.)  Thus, the court finds that the Complaint satisfies the pleading standard of Rule 8(a) with respect to the REDA claim.

### (b)  Prima Facie Case

REDA prohibits discrimination or retaliation against an employee for, among other things, filing a workers' compensation claim.  N.C. Gen. Stat. § 95-241(a)(1).  To state a claim under REDA, a plaintiff must show that (1) he exercised his right to engage in a protected activity, such as filing a workers' compensation claim; (2) he suffered an adverse employment action,[9]

---

[7]  The combination of REDA and public policy claims into a single count is curious in light of Smith's separate counts for his claims for intentional and negligent infliction of emotional distress.  (Doc. 4 at 4.)

[8]  Here again, the Complaint is curious in that, even though REDA authorizes the extraordinary relief of treble damages, Smith inexplicably declined to request them.

[9]  REDA broadly defines "retaliatory action" to include "the discharge, suspension, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the

18

and (3) a causal connection exists between the exercise of the protected activity and the alleged retaliatory action. Wiley v. United Parcel Serv., Inc., 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004). If a plaintiff presents a prima facie case of retaliatory termination, the burden shifts to the defendant to show, by a preponderance, that it "would have taken the same unfavorable action in the absence of the protected activity of the employee."[10] N.C. Gen. Stat. § 95-241(b). "Although evidence of retaliation . . . may often be completely circumstantial, the causal nexus between protected activity and retaliatory discharge must be something more than speculation." Swain v. Elfland, 145 N.C. App. 383, 387, 550 S.E.2d 530, 534 (2001).

---

terms, conditions, privileges, and benefits of employment." N.C. Gen. Stat. § 95-240(2).

[10] Although some federal district courts have applied the burden-shifting analysis established for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the North Carolina Supreme Court declined to adopt that analysis and instead applies the "terms of the statute itself." Wilkerson v. Pilkington N. Am., Inc., 211 F. Supp. 2d 700, 707 (M.D.N.C. 2002) (quoting Abels v. Renfro Corp., 335 N.C. 209, 214, 436 S.E.2d 822, 825 (1993)). Title VII decisions remain as "'guidance in establishing evidentiary standards and principals [sic] of law to be applied in discrimination cases.'" Id. (quoting Abels, 335 N.C. at 218, 436 S.E.2d at 827).

CTG concedes the first two elements[11] and contends that Smith has failed to demonstrate causal connection, pointing to the temporal proximity between the filing of his claim and termination and arguing that the time period cannot be shortened by relying on his notification on February 20, 2006, that he needed surgery. (Doc. 28 at 11-12; Doc. 36 at 3-4, 7.) Smith responds that the timing (both as of the filing of the claim and of the later notification of his surgery, which heightened the potential expense his injury caused) establishes a prima facie case as a matter of law and, if not, that direct and circumstantial evidence substantiate a causal connection. (Doc. 31 at 8-14; Tr. of Oral Argument at 40-43.)

To satisfy the element of causal connection, a plaintiff may present evidence of close temporal proximity between the protected activity and the adverse employment action, or a pattern of conduct. <u>Allen v. Grandfather Home for Children, Inc.</u>, No. 1:99CV73-C, 2000 U.S. Dist. LEXIS 21255, at *9 (W.D.N.C. Aug. 30, 2000). Although some courts require close temporal proximity, <u>Johnson v. Trustees of Durham Tech. Cmty. Coll.</u>, 139 N.C. App. 676,

---

[11] CTG may have conceded too much. Borden's uncontradicted testimony indicates that terminations from CTG are effective upon termination of a client's purchase order where no suitable jobs are "ready and waiting." (Doc. 33 Borden Dep. at 175.) Because REDA covers only retaliatory actions "taken against an *employee*" and no job was available for Smith, there is a serious question whether Smith was an "employee" for purposes of REDA once IBM terminated his purchase order. N.C. Gen. Stat. § 95-240(2).

681-82, 535 S.E.2d 357, 361 (2000) (quoting Shaffner v. Westinghouse Elec. Corp., 101 N.C. App. 213, 216, 398 S.E.2d 657, 659 (1990) (holding that employee failed to make out a cause of action under predecessor statute to REDA when there was no close temporal connection)), other courts find that direct evidence of retaliatory conduct is sufficient even in the absence of close temporal proximity. Tarrant v. Freeway Foods of Greensboro, Inc., 163 N.C. App. 504, 511, 593 S.E.2d 808, 813 (2004).

Courts have established the general parameters of close temporal proximity for purposes of REDA on a case-by-case basis.[12] At one extreme, courts have found a time period of approximately one month or less to constitute close temporal proximity. Lilly, 302 F. Supp. 2d at 481-82 (one day); Martin, 2001 U.S. Dist. LEXIS

_____

[12] In appropriate cases, close temporal proximity alone may satisfy the causal connection element of the prima facie case under REDA. Lilly v. Mastec N. Am., Inc., 302 F. Supp. 2d 471, 482 (M.D.N.C. 2004); Martin v. Nationwide Mut. Ins. Co., No. 1:99CV00956, 2001 U.S. Dist. LEXIS 9838, at *24-25 (M.D.N.C. Apr. 20, 2001); Brown v. Sears Auto. Ctr., 222 F. Supp. 2d 757, 764 n.10 (M.D.N.C. 2002) ("in some instances, the necessary causal connection can be inferred when an adverse employment action occurred very quickly after the employee engaged in protected activity"). In Title VII cases, to which courts may refer for guidance in REDA cases, courts have ruled that while proof of close temporal proximity "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality." Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989); see Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). By contrast, courts have also found that "temporal proximity alone will not support an inference [of causal connection] in the face of compelling evidence that the defendant company encouraged complaints about the relevant grievance." Fenton v. HiSAN, Inc., 174 F.3d 827, 832 (6th Cir. 1999); see Salter v. E&J Healthcare, Inc., 155 N.C. App. 685, 692, 575 S.E.2d 46, 50 (2003).

9838, at *28-29 (less than one month). At the other extreme, courts have held a time period of more than two and one-half months to constitute the absence of close temporal proximity. <u>Salter</u>, 155 N.C. App. at 691, 575 S.E.2d at 50 (approximately eighty-one days); <u>Brown</u>, 222 F. Supp. 2d at 764 n.10 (at least three months); <u>Shaffner</u>, 101 N.C. App. at 216, 398 S.E.2d at 659 (two and one-half to three months).[13] <u>But see</u> <u>Tarrant</u>, 163 N.C. App. at 511, 593 S.E.2d at 813 (finding causal relationship based on direct evidence six years after filing of workers' compensation claim). A grey area appears to exist for periods between one month and two and one-half months.

The record reveals a seventy-day period between Smith's filing of his workers' compensation claim on January 5, 2006, and his

---

[13] Courts differ in their calculation of the time period in <u>Shaffner</u>. In <u>Shaffner</u>, the defendant suspended the plaintiff approximately two and one-half months after the plaintiff filed a workers' compensation claim. 101 N.C. App. at 215-16, 398 S.E.2d at 659. The defendant subsequently terminated the plaintiff three months after the filing of the claim, retroactive to the date of suspension. <u>Id.</u> Although most courts calculate the temporal proximity in this case using the date of the termination decision (three months, or 90 days), <u>Brown</u>, 222 F. Supp. 2d at 764 n.10; <u>Greene v. Dialysis Clinic, Inc.</u>, 159 F. Supp. 2d 228, 240 (M.D.N.C. 2001); <u>Wiley v. United Parcel Serv., Inc.</u>, 102 F. Supp. 2d 643, 651 (M.D.N.C. 1999); <u>Sayers v. ABB C-E Servs., Inc.</u>, No. 4:97CV37, 1997 U.S. Dist. LEXIS 18304, at *16-17 (W.D.N.C. Oct. 15, 1997); <u>Watkins v. Martin Mills, Inc.</u>, No. 3:96CV178, 1996 U.S. Dist. LEXIS 19863, at *10 (M.D.N.C. Dec. 13, 1996); <u>Allen</u>, 2000 U.S. Dist. LEXIS 21255, at *9, a few courts use the date of the suspension (approximately two and one-half months, or 72 days). <u>Branham v. Wal-Mart Assocs., Inc.</u>, No. 1:03CV00576, 2004 U.S. Dist. LEXIS 19215, at *13 (M.D.N.C. Aug. 30, 2004); <u>Salter</u>, 155 N.C. App. at 692, 575 S.E.2d at 50; <u>Hutton v. Glosson Freightways, Inc.</u>, No. COA02-390, 2003 N.C. App. LEXIS 1676, at *11 (N.C. App. Aug. 19, 2003).

termination from CTG on March 16, 2006.[14]  The court cannot say that this seventy-day period is insufficient as a matter of law, nor is it short enough alone to constitute a prima facie case.  To be sure, the court is aware of no case that holds that such a time period fails to show close temporal proximity for a REDA claim as a matter of law.

REDA covers a broader range of protected activities than just the filing of a claim, however, including the "provi[sion of] information to any person with respect to the [Workers Compensation Act]."  N.C. Gen. Stat. § 95-241(a)(1); see Lilly, 302 F. Supp. 2d at 481-82 (holding that "negotiating a settlement falls within the protection of the REDA").  But see Branham, 2004 U.S. Dist. LEXIS 19215, at *13 (declining to find that REDA protects the plaintiff's receipt of benefits, communications with defendant regarding her condition, and participation in a site evaluation).  REDA is therefore potentially broad enough to encompass Smith's notification of his need for surgery, which was within thirty days of his termination.  (Doc. 33 Borden Dep. at 129-33.)

---

[14]  CTG asserts that "[i]t is undisputed that Plaintiff filed his workers' compensation claim over three months prior to his termination." (Doc. 36 at 3.)  Although Smith may have injured his knee over three months prior to his termination (Doc. 28 Ex. A at 102; Doc. 31 Ex. A ¶ 6), he filed his workers' compensation claim a handful of days less than two and one-half months prior to his termination.

If the timing alone is not sufficient, Smith argues, other alleged direct[15] and indirect[16] evidence establishes a causal connection between the protected activity and his termination. Courts permit plaintiffs to establish causal connection through direct evidence of retaliatory termination. Lilly, 302 F. Supp. 2d at 483-84 (finding direct evidence of retaliation when the employer stated it did not want plaintiff to return to work, thought plaintiff had exaggerated his injuries, and expressed its frustration that plaintiff received disability checks without working); Tarrant, 163 N.C. App. at 511, 593 S.E.2d at 813 (finding that the employer admitted that the employee was terminated for pursuing her workers' compensation rights). Courts also allow plaintiffs to introduce reasonable inferences of a causal connection between the protected activity and the termination. Wilkerson, 211 F. Supp. 2d at 709; Watkins, 1996 U.S. Dist. LEXIS 19863, at *9; Wiley, 164 N.C. App. at 187-88, 594 S.E.2d at 811-12.

---

[15]  Smith relies on his claim that "Borden advised me that the 'IBM thing might not be for you.  If you leave today, you can file for unemployment and I won't contest it.'"  (Doc. 31 Ex. A ¶ 9.)  Smith further claims that "Borden immediately showed dissatisfaction with my physical limitations and an unwillingness to accommodate me."  (Id.)

[16]  Smith points to (1) the date of his termination letter from CTG; (2) his good technical performance record; (3) CTG's failure to compel IBM to accommodate his physical limitations; (4) CTG's refusal to redeploy him; (5) the discontinuance of his workers' compensation benefits; and (6) other financial incentives.  (Doc. 31 at 5, 9, 11-12; Tr. of Oral Argument at 34-39, 48, 53-54, 56-60, 63-64.)

The court need not determine whether Smith is right and will assume that he could make out his prima facie case for purposes of this motion because, as shown below, the court concludes that CTG has demonstrated its affirmative defense as a matter of law.[17]

---

[17] It is worth noting that much of Smith's purported evidence of a causal connection is at best problematic. First, with respect to the direct evidence, Borden made the alleged comments after listening to Smith's complaints about Parris. (Doc. 31 Ex. A ¶ 9; Doc. 33 Borden Dep. at 190-93.) Although Smith interprets these as evidence of Borden's hostility towards his injury (Doc. 31 Ex. A ¶ 9), the context instead suggests that Borden sought to accommodate Smith's apparent desire to separate from IBM (Id.; Doc. 33 Borden Dep. at 190-93), with which he was admittedly frustrated, if not angry (Doc. 28 Ex. A at 112-13, Ex. H at 113-14, 115-26; Doc. 31 Ex. A ¶ 8).

Second, Smith argues that the alleged reasons for termination were merely pretextual because CTG's termination letter was dated prior to the occurrence of those reasons. (Doc. 31 at 5, 11; Tr. of Oral Argument at 53-54, 56-60.) This argument contradicts Smith's own testimony that, during the March 16 termination meeting, Borden approved his taking another job with IBM (Doc. 59 Ex. A at 47) and, if anything, serves only to rebut CTG's alleged reasons for termination.

Third, Smith's good technical performance ignores the undisputed record evidence of his failure to abide by the requests of IBM's managers (Doc. 28 Ex. C ¶ 6, Ex. F ¶¶ 8-10, Ex. H at Ex. 23; Doc. 33 Borden Dep. at 38-39, 50-52, 71-75, 79-80, 83-85, 98-99, 107-08, 136-38, 140-43, 163-64, 165-70) and his personality conflict with IBM's Parris (Doc. 28 Ex. A at 79, 85-86, 99-100, 125-26, Ex. H at 113-26; Doc. 31 Ex. A ¶ 8; Doc. 33 Borden Dep. at 82-83, 96, 138, 190-91, 214-15, West Dep. at 44, 46-47, 73-75), which rose to the level that Smith required a "mediator" or "go-between" (Doc. 28 Ex. A at 79-80, 125-26).

Fourth, Smith's arguments on failure to accommodate are directed in reality to IBM — which is not a party — rather than to CTG. (Doc. 31 at 9; see Doc. 28 Ex. A at 115-17, 122; Doc. 31 Ex. A ¶ 7; Doc. 33 Borden Dep. at 52, 60, 169-71.) To the extent these arguments could be read otherwise, failure to accommodate is not actionable under REDA. Wilkerson, 211 F. Supp. 2d at 711; Watkins, 1996 U.S. Dist. LEXIS 19863, at *10; Wiley, 164 N.C. App. at 187, 594 S.E.2d at 812.

Fifth, as to termination of his workers' compensation benefits, Smith offers no credible evidence that CTG played any role in the decision of Gallagher Bassett, its third-party administrator, which had sole

25

discretion to accept or deny a claim. (Doc. 28 Ex. E ¶ 4; Tr. of Oral Argument at 36-37.) Smith relies on the insurance carrier's use of the term "employer/administrator" on the form denying his workers' compensation claim (Form 61), as well as on the joint-defendant status of CTG and the insurance carrier in their response to Smith's request for a hearing regarding this denial (Form 33R). (Doc. 60 at 1, Ex. A.) This reliance fails, however, because (1) the insurance carrier merely paraphrased the boilerplate language on Form 61 itself; (2) these forms do not rebut either the uncontradicted testimony or admission of Smith's counsel that CTG did not direct compensation coverage decisions. (Doc. 28 Ex. E ¶ 4; Tr. of Oral Argument at 36-37.)

Sixth, as to termination of Smith's other benefits, the record is clear that his salary and benefits (other than his retention bonus) ended upon IBM's termination of his purchase order (Doc. 28 Ex. A at Ex. 19, Ex. H at Ex. 23; Doc. 33 Borden Dep. at 172-75; Tr. of Oral Argument at 12-14), and that termination of the retention bonus actually provides a non-discriminatory motive for his termination.

Seventh, Smith provides no evidence to counter the circumstances surrounding his workers' compensation claim. Smith concedes that CTG not only encouraged him to file a workers' compensation claim, but also *insisted that he do so*. (Doc. 28 Ex. A at 68-69; Tr. of Oral Argument at 40; see Doc. 28 at 12-13; Doc. 36 at 4); see Fenton, 174 F.3d at 832; see Salter, 155 N.C. App. at 692, 575 S.E.2d at 50. CTG also allowed Smith to continue working after filing his claim, even well after he notified Borden of the surgery. (Doc. 28 Ex. A at 101-02, Ex. E ¶¶ 5-6, Ex. H at 58, Ex. 23; Doc. 33 Borden Dep. at 129-33, 172-73); see Wiley, 102 F. Supp. 2d at 652; Sayers, 1997 U.S. Dist. LEXIS 18304, at *16; Watkins, 1996 U.S. Dist. LEXIS 19863, at *11; Salter, 155 N.C. App. at 691-92, 575 S.E.2d at 50; Morgan v. Musselwhite, 101 N.C. App. 390, 393, 399 S.E.2d 151, 153 (1991). Furthermore, Smith actually received workers' compensation benefits. (Doc. 31 Ex. A ¶ 6); see Watkins, 1996 U.S. Dist. LEXIS 19863, at *11; Salter, 155 N.C. App. at 692, 575 S.E.2d at 50.

Finally, perhaps most difficult for Smith and as noted in the section to follow, the uncontradicted evidence is that CTG had no job available for him after IBM let him go and that under such circumstances Smith's CTG employment terminated upon IBM's termination of his purchase order. Sanhueza v. Dillard Dep't Stores, Inc., No. 98-1788, 1999 U.S. App. LEXIS 8263, at *4 (4th Cir. Apr. 29, 1999) (indicating that the absence of any replacement position is evidence against a causal connection); Greene, 159 F. Supp. at 240 (same).

26

### (c) **Affirmative Defenses**

Even if Smith could establish a prime facie case under REDA, the statute provides an affirmative defense if the employer "would have taken the same unfavorable action in the absence of the protected activity of the employee." N.C. Gen. Stat. § 95-241(b). CTG "has a burden of persuasion, not production, in making this showing" under a preponderance standard. <u>Wilkerson</u>, 211 F. Supp. 2d at 707 n.4. Here, the record reflects undisputed evidence that entitles CTG to this affirmative defense on several bases.

CTG has articulated five primary reasons for terminating Smith for cause: (1) obstruction of the client's and CTG's attempts to collect passwords to an IBM-owned laptop computer; (2) enrollment in an unauthorized training class; (3) dissatisfaction of the client; (4) refusal to comply with the CTG site manager's instructions that he meet her in the hallway outside the training room; and (5) disruptive outburst while leaving the training room.[18] (Doc. 28 at 13-15; Doc. 36 at 8.) While Smith attempts to create

---

[18] CTG emphasizes different reasons for the termination in different parts of the record. If a defendant provides inconsistent reasons for a termination, the court generally should not rule, as a matter of law, that the defendant has met its burden of persuasion on the affirmative defense. <u>Bumgardner v. Spotless Enters., Inc.</u>, 287 F. Supp. 2d 630, 637 (W.D.N.C. 2003). Nevertheless, CTG essentially terminated Smith for insubordination and has not exhibited any internal inconsistency in its recitation of reasons. Thus, CTG remains eligible to receive a judgment as a matter of law on its affirmative defenses.

a genuine issue of material fact as to all but reason (4), he succeeds only with respect to reason (5).[19]

Smith's obstruction of the attempts to collect passwords to the IBM-owned laptop computer provided CTG with an indisputably non-retaliatory basis for terminating him. During the March 16 meeting, at Borden's request, Smith accessed the computer using passwords, removed family photographs, provided various passwords to Borden, and signed a CTG Employee Separation Checklist that contained the passwords. (Doc. 28 Ex. A at 182, 187-88, Ex. 19, Ex. F ¶ 11, Ex. H at 44; Doc. 31 Ex. A ¶ 12; Doc. 33 Borden Dep. at 116-17, 118-19, 126-27, 148, 158-59, 218.) Neither Borden nor IBM could use the passwords, which IBM determined to be incorrect. (Doc. 28 Ex. C ¶ 9, Ex. F ¶ 12, Ex. H at Ex. 23; Doc. 33 Borden Dep. at 116-17, 122-23, 218, 220-21; Doc. 34 Parris Dep. at 89-90, 91.) Smith contends that Borden transcribed the passwords incorrectly or that IBM must not have asked a technically inclined person to enter the passwords into the laptop. (Doc. 28 Ex. A at 187-88, 190-91, Ex. H at 60-65; Tr. of Oral Argument at 51-53.) These contentions are belied both by Smith's signature on the March 16 Separation Checklist and the fact that Smith subsequently sent

_____

[19] Because Smith's alleged outburst (i.e., reason (5)) was disputed (compare Doc. 28 Ex. C ¶¶ 8-9 and Doc. 33 Borden Dep. at 101-02, 108-09, 144-46 with Doc. 28 Ex. A at 182, 187, 188, 190, 191, Ex. H at 44, 60-64, Doc. 31 Ex. A ¶¶ 11-12, and Doc. 33 West Dep. at 50-52, 82), it does not serve as a ground for summary judgment.

28

CTG and IBM additional, *different* passwords (including one called "AZZH0LES"). (Doc. 28 Ex. A at 182, 187-88, Ex. 17, Ex. F ¶ 12, Ex. H at Ex. 23; Doc. 33 Borden Dep. at 116-17, 118-19, 124-26, 148, 158-59, 217-18, 221; Doc. 34 Parris Dep. at 91-92). To date, IBM contends that none of the passwords is correct and that it cannot access the computer.[20] (Doc. 28 Ex. F ¶ 12; <u>see</u> Doc. 28 Ex. C ¶ 9; Doc. 33 Borden Dep. at 123-26, 128, 220-22.) CTG's determination that Smith's conduct constituted insubordination, a ground listed in his termination letter, is supported by Smith's own evidence. Even if Smith's arguments were correct, CTG's reliance on its client's conclusions that the passwords were wrong is a non-discriminatory ground for termination of an at-will employee.[21]

Smith's attendance at the training class also serves as an independent ground for termination. Ramirez testifies that Smith

---

[20] The record indicates that IBM has the ability to "wipe" the computer clean. (Doc. 28 Ex. A at 187, Ex. H at 61; Doc. 33 West Dep. at 50-51.) Of course, this solution would be unacceptable to any employer because it would destroy all the work product stored on the computer.

[21] The record contains no evidence that IBM had anything to do with Smith's workers' compensation claim. <u>Cf.</u> <u>Williams v. Grimes Aerospace Co.</u>, 988 F. Supp. 925, 937-38 (D.S.C. 1997)(holding that in the Title VII context, an employment agency is liable for discrimination only if it knew or should have known of the client's wrongful conduct and failed to take corrective measures within its control).

was not authorized to attend a training class on March 16, 2006.[22] (Doc. 28 Ex. F ¶ 11; <u>see</u> Doc. 28 Ex. C ¶ 8, Ex. H at Ex. 23; Doc. 33 Borden Dep. at 99-100, 108, 112-13, 114-15, 143-44.) Although Smith counters that Parris had authorized him to attend this training class, which was rescheduled from January 26 to *March 14* (Doc. 31 Ex. A ¶ 11), Smith provides no such testimony from Parris and Borden found Smith in the class on *March 16* (Doc. 33 Borden Dep. at 99-100, 106, 108, 114-15, 180). Regardless of whether Smith was authorized to attend a March 14 or March 16 training class, the issue again is whether Ramirez's testimony provided CTG with a reasonable, non-retaliatory ground for terminating Smith's at-will employment. The court concludes it did.

CTG had several other independent and non-retaliatory grounds for terminating Smith for cause based on IBM's dissatisfaction with him. The record reveals numerous instances of poor behavior towards a significant client, some of which were also set forth in Smith's termination letter from CTG. This behavior included (1) a hostile work attitude towards IBM management (Doc. 28 Ex. A at 79-80, 85-86, 125-26, Ex. H at 113-14; Doc. 33 West Dep. at 44-47, 73-75); <u>Wiley</u>, 102 F. Supp. 2d at 653; (2) unsatisfactory attendance at his assigned Building 205 (Doc. 28 Ex. C ¶ 6, Ex. F ¶¶ 9-10;

---

[22] IBM monitored training attendance because it bore the expense. (Doc. 33 Borden Dep. at 115.)

Doc. 33 Borden Dep. at 50, 71-75, 79-80); <u>Thomas v. Eaton Corp.</u>, No. 1:95CV00660, 1996 U.S. Dist. LEXIS 16158, at *14 (M.D.N.C. Oct. 7, 1996); (3) failure to keep his IBM manager and CTG supervisor apprised of his whereabouts (Doc. 28 Ex. C ¶ 6, Ex. F ¶¶ 9-10; Doc. 33 Borden Dep. at 50, 71-75, 79-80, 83-85, 98-99, 107-08, 136-38, 140-43, 163-64); <u>Thomas</u>, 1996 U.S. Dist. LEXIS 16158, at *14; (4) disregard of explicit instructions from IBM and CTG (Doc. 28 Ex. F ¶¶ 8-10, Ex. H at Ex. 23; Doc. 33 Borden Dep. at 38-39, 50-52, 71-75, 83-85, 98-99, 107-08, 136-38, 140-43, 163-64, 165-70); <u>Thomas</u>, 1996 U.S. Dist. LEXIS 16158, at *14; and (5) resistance to changes in his work schedule (Doc. 28 Ex. A at Ex. 20, Ex. F ¶¶ 8-10, Ex. H at Ex. 23; Doc. 33 Borden Dep. at 50-52, 71-75, 79-80, 98-99, 107-08, 136-38, 140-43, 163-64, 165-70); <u>Wiley</u>, 102 F. Supp. 2d at 652; <u>Thomas</u>, 1996 U.S. Dist. LEXIS 16158, at *14.

In addition to creating poor client relations, this behavior provided independent grounds for termination because it violated CTG policies and constituted insubordination. <u>Wilkerson</u>, 211 F. Supp. 2d at 710; <u>Greene</u>, 159 F. Supp. 2d at 240; <u>Watkins</u>, 1996 U.S. Dist. LEXIS 19863, at *12-13; <u>Thomas</u>, 1996 U.S. Dist. LEXIS 16158, at *14. These grounds were also supplemented by Smith's failure to leave the training class and meet Borden in the hallway, as she directed — a fact Smith does not dispute and which CTG deemed to be

31

further evidence of insubordination.  (Doc. 33 Borden Dep. at 100-02, 144-46, 205; <u>see</u> Doc. 28 Ex. C ¶ 9.)

Though not directly raised by the parties, the court finds that most difficult for Smith is the uncontradicted evidence that CTG had no jobs available for him after IBM terminated his purchase order.  Smith acknowledges that CTG attempted to accommodate his requests for redeployment (perhaps a confirmation of his brewing conflict with his IBM program leader) as early as January 2006. (Doc. 28 Ex. H at 57-58.)  Although Powers and Borden both attempted to locate suitable positions, the positions either did not come to fruition or did not meet his salary demands.[23]  (Doc. 33 Powers Dep. at 54, Borden Dep. at 152, 176.)  On March 13, 2006, after IBM informed CTG of its intention to terminate Smith later that week, Borden again checked CTG's requisition sheet for available positions but could not locate anything that matched Smith's qualifications and salary demands.  (<u>Id.</u> Borden Dep. at 153-57, 176-77.)

Smith belittles CTG's efforts and claims that Borden testifies that "she had access to hundreds of other positions for which the plaintiff was qualified."  (Doc. 31 at 11.)  But Smith misstates

_____

[23]  Smith states that  Borden made an effort to redeploy him before, but not after, his injury.  (Doc. 31 at 11.)  Borden could not have made an effort to redeploy Smith before his injury because she started working as his site manager in January 2006 and the injury occurred in December 2005.  (<u>Id.</u> Ex. A ¶¶ 5-6.)

32

the record.[24]  Borden actually states that she spoke to hundreds of
candidates about positions over the course of a year in her former
job as a recruiter.  (Doc. 33 Borden Dep. at 19-20.)  She also
estimates that CTG placed over two hundred candidates in a broad
range of positions at IBM in 2007.[25]  (Id. Borden Dep. at 23-24.)
However, these general statistics had nothing to do with Smith, his
qualifications, or the limited time period during which CTG
actively sought to place him in another position.  More
importantly, Smith has failed to offer any evidence that a suitable
position existed for his skill set and in his requested salary
range.[26]  In the end, Smith's argument relies solely on
impermissible conjecture.  Wiley, 164 N.C. App. at 187, 594 S.E.2d
at 811 ("the causal nexus between protected activity and

---

[24]  This misstatement is not the only problem with Smith's Brief.
Smith also failed to provide citations to the record in the Argument
section of his Brief, even when the purported facts are not addressed by
the Statement of Facts.  Furthermore, Smith violated Local Rule 7.3(e)
by filing complete, lengthy depositions instead of relevant excerpts.

[25]  Borden stated that she recruited CTG employees from the candidate
pool for placement at various clients.  (Doc. 33 Borden Dep. at 17.)
Borden clarified that candidates must have specific skills and must meet
the salary requirements.  (Id. at 17-19.)  Borden subsequently elaborated
on employee qualifications, stating that Smith's "education group is very
unique" and that positions often involve "very different groups,
different function[s], [and] different skill set[s]." (Id. at 156-57.)

[26]  In a deposition, Smith suggests that he had two job offers from
IBM on the day of his termination.  (Doc. 59 Ex. A at 47.)  Although this
testimony indicates that Smith received inquiries regarding his
availability (id.), nothing demonstrates that these inquiries were from
managers authorized to extend offers of employment or that they ever
could have matured into actual offers.

33

retaliatory discharge must be something more than speculation"). Further, even Smith concedes that, as a legal matter, CTG had no legal obligation to redeploy him after IBM terminated him.[27] (Tr. of Oral Argument at 50; see Doc. 33 Powers Dep. at 24-25, 28); see also Wiley, 102 F. Supp. 2d at 652; Sayers, 1997 U.S. Dist. LEXIS 18304, at *12 (holding that REDA "does not provide a remedy for retaliatory failure to recall, only for retaliatory discharge.").

In summary, even if Smith could have created a genuine issue of material fact as to the causal connection element of a prima facie case under REDA, CTG has proven on multiple bases that it is entitled to the affirmative defense as a matter of law under N.C. Gen. Stat. § 95-241(b). CTG's Motion for Summary Judgment as to the REDA claim is therefore GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 3. Public Policy

CTG also moves for summary judgment on Smith's claim that CTG violated the public policy embodied in REDA, N.C. Gen. Stat. § 95-241, by terminating him for filing a workers' compensation claim. (Doc. 27 at 1; see Doc. 4 at 3, 4.) In North Carolina, the at-will employment doctrine states that "in the absence of a contractual

---

[27] It is for this additional reason that the court has grave doubts that Smith could establish the causal connection element of a prima facie REDA claim. Courts have found that the absence of any replacement positions is strong evidence against a causal connection between the protected activity and the alleged retaliatory action. Sanhueza, 1999 U.S. App. LEXIS 8263, at *4; Greene, 159 F. Supp. at 240.

34

agreement between an employer and an employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party." Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997). The North Carolina Supreme Court recognized a limited exception to the "at will" employment doctrine for a wrongful termination in violation of public policy.[28] Coman v. Thomas Mfg. Co., 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989). "[P]ublic policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes," Amos v. Oakdale Knitting Co., 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992), including the termination of an employee for exercising his workers' compensation rights. Brackett v. SGL Carbon Corp., 158 N.C. App. 252, 260, 580 S.E.2d 757, 762 (2003). To establish a prima facie case of retaliation based on public policy, a plaintiff must show that "(1) [it] . . . engaged in a protected activity, (2) the employer took adverse action, and (3) there existed a causal connection between the protected activity and the adverse action." Salter, 155 N.C. App. at 693, 575 S.E.2d at 51.

---

[28] Public policy is "the principle of law that holds no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." Salter, 155 N.C. App. at 693, 575 S.E.2d at 51 (internal quotation marks and citation omitted).

Smith acknowledges that this wrongful termination claim rests upon the very public policy underlying REDA (Doc. 4 and 4), which constitutes the North Carolina General Assembly's position on worker's compensation-based retaliation. <u>Salter</u>, 155 N.C. App. at 696, 575 S.E. 2d at 21-22. Smith's claim therefore rises or falls on the viability of his REDA claim. <u>Johnson v. Pepperidge Farm, Inc.</u>, No. 93-1386, 1994 U.S. App. LEXIS 6968, at *12 (4th Cir. Apr. 4, 1994); <u>Branham</u>, 2004 U.S. Dist. LEXIS 19215, at *24; <u>Watkins</u>, 1996 U.S. Dist. LEXIS 19863, at *17; <u>Thomas</u>, 1996 U.S. Dist. LEXIS 16158, at *23. Because the court has determined that no REDA liability exists, Smith's public policy claim must fail as a matter of law. Therefore, CTG's Motion for Summary Judgment as to his public policy claim is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

### 4. Intentional Infliction of Emotional Distress

CTG moves for summary judgment on Smith's claim for intentional infliction of emotional distress. (Doc. 27 at 1; <u>see</u> Doc. 4 at 4.) Under North Carolina law, the essential elements of this tort are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another." <u>Dickens v. Puryear</u>, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981); <u>accord</u> <u>Simmons v. Chemol Corp.</u>, 137 N.C. App. 319, 325, 528 S.E.2d 368, 371 (2000). "The tort may also exist where

36

defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress." <u>Dickens</u>, 302 N.C. at 452, 276 S.E.2d at 335. CTG argues that none of the alleged conduct was sufficiently extreme and outrageous to satisfy the first element and asserts that Smith has not suffered severe emotional distress, as required under the third element. (Doc. 28 at 16-18; Doc. 36 at 9, 10.)

"Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Smith-Price v. Charter Behavioral Health Sys.</u>, 164 N.C. App. 349, 354, 595 S.E.2d 778, 782 (2004) (internal quotation marks and citation omitted). The conduct must exhibit more than "mere insults, indignities, [or] threats." <u>Wagoner v. Elkin City Schs.' Bd. of Educ.</u>, 113 N.C. App. 579, 586, 440 S.E.2d 119, 123 (1994) (internal quotation marks and citation omitted). North Carolina courts rarely "find conduct in the employment context that will rise to the level of outrageousness necessary to support a claim of intentional infliction of emotional distress." <u>Thomas v. N. Telecom, Inc.</u>, 157 F. Supp. 2d 627, 635 (M.D.N.C. 2000); <u>see</u> <u>Locklear v. Person County Bd. of Educ.</u>, No. 1:05CV00255, 2006 U.S. Dist. LEXIS 42203, at *47-48 (M.D.N.C. June 22, 2006); <u>Jackson v. Blue Dolphin Commc'ns of</u>

37

N.C., L.L.C., 226 F. Supp. 2d 785, 794 (W.D.N.C. 2002); Haburjak v. Prudential-Bache Sec., Inc., 759 F. Supp. 293, 302-03 (W.D.N.C. 1991) (listing state court cases).  This employment context includes retaliatory termination cases arising under REDA.  Martin, 2001 U.S. Dist. LEXIS 9838, at *31-35; Allen, 2000 U.S. Dist. LEXIS 21255, at *12-13.  "Whether or not conduct constitutes extreme and outrageous behavior is initially a question of law for the court." Simmons, 137 N.C. App. at 325, 528 S.E.2d at 372.

Smith alleges that CTG intentionally terminated his employment, health benefits, and workers' compensation benefits, even though it knew of his physical condition, and failed to redeploy him.  (Doc. 31 at 15.)  Smith points to the behavior of IBM employees, including Parris, whom Smith calls "agents" of CTG. (Id.)  Smith has identified no factual or legal basis for holding IBM as CTG's agent and in fact has it backwards; if anything, the client, IBM, would be the principal, and CTG its agent.  Smith has elected to pursue his lawsuit against CTG alone, and the court will not attribute to CTG the conduct of employees of a separate legal entity not a party to the case.  As to CTG, Smith has not demonstrated any examples of extreme or outrageous conduct by its employees rising to the level required by law.[29]  Compare Dickens, 302 N.C. at 439, 454-55, 276 S.E.2d at 327, 336-37 (finding alleged

---

[29]  The same would be true of IBM's employees, even if their conduct could be considered.

conduct extreme and outrageous when defendants pointed pistol between plaintiff's eyes, beat him into semi-consciousness with nightsticks, and threatened him with castration), <u>Brown v. Burlington Indus., Inc.</u>, 93 N.C. App. 431, 432, 435-36, 378 S.E.2d 232, 233, 234-35 (1989) (finding alleged conduct extreme and outrageous when employee's supervisor made sexually explicit remarks and gestures two to three times a week over an extended period of time), <u>and</u> <u>Hogan v. Forsyth Country Club Co.</u>, 79 N.C. App. 483, 490, 492-93, 340 S.E.2d 116, 121, 122 (1986) (finding alleged conduct extreme and outrageous when supervisor engaged in unwanted sexual touching of plaintiff, screamed profanities at her when she refused his advances, threatened her with bodily injury, and pulled a knife on her), <u>with</u> <u>Atkins v. USF Dugan, Inc.</u>, 106 F. Supp. 2d 799, 810-11 (M.D.N.C. 1999) (finding conduct not extreme or outrageous when employee was told he was "too old and sick" to handle his job and was allegedly terminated in violation of federal and state discrimination laws), <u>Pardasani v. Rack Room Shoes Inc.</u>, 912 F. Supp. 187, 192 (M.D.N.C. 1996) (finding conduct not extreme and outrageous when plaintiff alleged he was given poor performance evaluations, denied promotions available to others, excluded from training, and finally terminated from his employment), <u>Lorbacher v. Hous. Auth. of Raleigh</u>, 127 N.C. App. 663, 676, 493 S.E.2d 74, 81-82 (1997) (finding conduct not extreme and outrageous when

discharge was allegedly in retaliation for exercise of First Amendment rights), and Hogan, 79 N.C. App. at 493-94, 340 S.E.2d at 122-23 (finding conduct not extreme or outrageous when co-employee screamed and shouted at plaintiff, called her names, and threw menus at her).

For these reasons, CTG's Motion for Summary Judgment as to Count Two is GRANTED, and this claim is DISMISSED WITH PREJUDICE.[30]

## 5.  Negligent Infliction of Emotional Distress

CTG also seeks summary judgment on Smith's claim for negligent infliction of emotional distress. (Doc. 27 at 1; see Doc. 4 at 4.) CTG claims that the claim is barred by the North Carolina Workers' Compensation Act, N.C. Gen. Stat. § 97-10.1 (the "Workers' Compensation Act"), and argues that the evidence fails on this claim as a matter of law. (Doc. 28 at 18-20; Doc. 36 at 10.) Because the latter argument carries the day, the court need not decide the former.[31]

---

[30]  Because the conduct fails to reach the requisite legal threshold, the court need not decide Smith's claim that he suffers from the type of severe emotional distress required by law.

[31]  The Fourth Circuit has ruled in at least one context that the Workers' Compensation Act bars a claim for negligent infliction of emotional distress arising out of a retaliatory termination. Johnson, 1994 U.S. App. LEXIS 6968, at *13. Exceptions have been carved out for cases that involve (1) racial discrimination, Thomas, 157 F. Supp. 2d at 636-37; or (2) sexual harassment, Boggess v. Roper, No. 3:04cv92, 2006 U.S. Dist. LEXIS 63057, at *27 (M.D.N.C. Sept. 1, 2006) (holding negligent infliction claims barred, but not those premised on sexual harassment); Ridenhour v. Concord Screen Printers, Inc., 40 F. Supp. 2d 744, 746 (M.D.N.C. 1999); Hogan, 79 N.C. App. at 496, 340 S.E.2d at 124.

The elements of negligent infliction of emotional distress are that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . ., and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). Here, too, Smith improperly relies on the conduct of IBM employees. (Doc. 31 at 15-16.) For the reasons previously identified, IBM's conduct cannot be attributed to CTG. As to CTG, Smith points to the "intentional" termination of his employment and benefits while he was "physically diminished," as well as Borden's alleged "refusal" to redeploy him. (Id. at 15.) Alternatively, if this conduct was not intentional, Smith argues that it constitutes at least negligence. (Id.)

Smith's claim is fundamentally at odds with his claim of retaliation, which is an intentional act and "cannot form the basis of a claim sounding in negligence." Bennett v. City of Greensboro, No. 1:02CV00366, 2002 U.S. Dist. LEXIS 26228, at *35 (M.D.N.C. Nov. 7, 2002); accord Mitchell v. Lydall, Inc., No. 93-1374, 1994 U.S. App. LEXIS 2177, at *9-10 (4th Cir. Feb. 10, 1994); Thomas, 157 F. Supp. 2d at 637. Smith's allegations of retaliatory termination in violation of REDA and the public policy of North Carolina are not

Whether conduct based on a REDA violation constitutes such an exception need not be decided here.

41

based on any alleged negligent behavior by CTG.[32]  <u>Reese v. Meritor</u>
<u>Auto., Inc.</u>, 5 Fed. App'x 239, 245 (4th Cir. 2001) (affirming grant
of summary judgment on claim for negligent infliction of emotional
distress because plaintiff failed to adduce evidence that defendant
acted negligently).

In addition, and even if CTG could be said to have acted
negligently, Smith also failed to create a genuine issue of
material fact concerning whether severe emotional distress was a
reasonably foreseeable result of the alleged retaliatory
termination on this record.  <u>Swaim v. Westchester Acad., Inc.</u>, 170
F. Supp. 2d 580, 584 (M.D.N.C. 2001) ("Plaintiff has not alleged
any facts that indicate the Defendants should have reasonably
foreseen that Plaintiff would react in any way other than the usual
anger and disappointment with being discharged."); <u>see</u> <u>Whiting v.</u>
<u>Weslowski</u>, 78 F. Supp. 2d 517, 524 (E.D.N.C. 1998), <u>aff'd in part</u>
<u>and vacated on other grounds</u>, <u>Whiting v. Ski's Auto World Paint &</u>
<u>Body Shop, Inc.</u>, 1999 U.S. App. LEXIS 23120 (4th Cir. Sept. 23,
1999).  Although Smith alleges that CTG knew of his physical

---

[32]  "Wrongful termination is not necessarily always intentional."
<u>Bumgardner</u>, 287 F. Supp. 2d at 638.  In <u>Bumgardner</u>, the court found that
an employer might "negligently rel[y] on improper information in deciding
to discharge" an employee in REDA and public policy cases, especially if
testimony reveals internal inconsistencies in the reasons for the
termination.  <u>Id.</u>  As discussed above, however, CTG has not proffered any
internally inconsistent reasons for terminating Smith.  The record also
does not suggest that CTG negligently relied on improper information from
IBM in deciding to terminate Smith.

condition when it terminated his employment, the evidence viewed in the light most favorable to Smith does not create a genuine issue that CTG should have reasonably foreseen that the termination would produce severe emotional distress.[33]

For the above reasons, CTG's Motion for Summary Judgment as to Count Three is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

## IV.  CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED AND ADJUDGED that:

1.  CTG's Motion to Strike (Doc. 37) pursuant to Federal Rule of Civil Procedure 56 is DENIED;

2.  CTG's Motion for Summary Judgment (Doc. 27) pursuant to Federal Rule of Civil Procedure 56 as to COUNTS One, Two and Three of the Complaint is GRANTED, and this action is DISMISSED, WITH PREJUDICE.

/s/ Thomas D. Schroeder
United States District Judge

July 22, 2008

---

[33]  In light of the court's ruling, it need not address whether Smith has created a genuine issue of material fact regarding whether he suffered severe emotional distress.  (Doc. 28 at 20; Doc. 36 at 10.)

43